This is case number 4-14-0954 in re the Marriage of the Otten. Attorney Greg Scott is here on behalf of the appellant. Attorney Rob Cross is here on behalf of the F. Lee. Mr. Scott, are you ready to proceed? I am. Okay, you may do so. May I please report? Counsel. Counsel. I represent Dan Otten in this appeal, and we have three basic areas that we'd ask this court to look at. And to consider making a reversal of the trial court. The first area that we ask you to look at is the designation of the maintenance that was awarded. As you know, in the Mayhall case, the difference, I guess, is the shifting of a burden of proof when in this matter, if and when it ever becomes subject to termination or request for termination. Under rehabilitative, it stays with the recipient. Under permanent, the person that is paying has the burden of proof to ask the court to terminate. Well, in this case, though, didn't the judge say, oh, I'll take another look at it in two years? He did, Judge. What is the burden then? Pardon me? What would be the burden of proof then? It would be my client's burden to prove it's, to extend it, because it's under rehabilitative. And it would be his duty to, under the statute, prove that he needs the continuation of maintenance and prove the amount that he needs given his circumstances. But in this case, I believe that the standards and the facts of the case make it qualified for permanent versus rehabilitative, and not just, let's just take another look at it. Because regardless of what happens, with this circumstance, with this, I guess, financial perfect storm, what we have here is will he ever meet that standard, which is will he ever be able to get enough education, training, or experience so that he would make a reasonable amount of money to where maintenance is never going to be needed. And in this situation, I don't think you can say that. He does have an accounting degree, bachelor's degree. He didn't work at Sickage long enough to be able to be certified as a CPA. So that means he's got an option to go back and say, okay, you can be an accountant, go back and try and become a CPA or try and work for a CPA firm. And as, you know, as was explained in the evidence, he has not worked in accounting since 1996. And honestly, you know, part of what Mr. Frost in his brief said was one of the things that they objected to was the 2013 tax return that he prepared. And they said, hey, you know, he deducts these attorney's fees that you can't deduct because they're not a business expense. Well, I mean, put yourself in an accounting firm's position. The guy can't even really properly prepare a tax return. He's been out of accounting and really never really practiced in it. So he's totally going to have to be retrained. He's going to be, if he's retrained, a company that would hire him would say, okay, I have a 51-year-old person that I'm going to have to retrain, retool, versus a recent graduate who's up on all of the information. Which of the two are you going to hire? If your prediction proves to be accurate, then two years from now, the claim for maintenance would even be more compelling, wouldn't it? It would. But the question is, why should we have to go do that? I mean, because it's obvious. I mean, we can go and exercise that legal right, I guess, as you say. But when you have facts in front of you where this person has operated a business, it's been unsuccessful, the party's new, it's been unsuccessful for years, and now we have a situation where we say, okay, you're trained to do one of two things. IT, you're not trained in current computer language. You're not trained in the ability to walk in somewhere and say, hey, I can run your system, or I can be a troubleshooter, I can be an IT guy, because you can't. He doesn't even know Microsoft. So what he knew was something that is antiquated now. What he knew was years ago. And yet he would have to go to LRS. He estimated three six-month programs. I think it may be realistic, it may not. But even then, he walks in, same type of position, 53 by that time, and says, hey, hire me, no experience and very little technical background. So what we have is if he gets hired, where does he get hired at? 35, 40, maybe 50? His last time that he worked in the IT at St. John's before he was laid off was $56,000. Whereas we have a person who the court found she is in the position that she is in with the clinic because of the support that he allowed from the home front that assisted her in the career. And she's accomplished. And to her credit, she has accomplished. But over the years, she has risen substantially at the clinic, both salary-wise and position-wise, and in part that is because of his actions at home. So as we look at the marital financial partnership law, as we look at it in Illinois, he helped her get to where she's at. And under Carpel, she just can't walk away. Too bad the marriage didn't work, I'm financially going to walk away from my responsibility.  She makes $280,000. His best case scenario, trained and retooled, $50,000, $60,000. You're never going to bridge that gap in the lifestyle. What about the length of the marriage? Length of marriage is 14 years. It's not the typical case where you say permanent is somewhere around 18 to 20. So we're four years shy of that. But we have circumstances. I mean, we have had permanent maintenance cases, as this court is aware, when there's unusual circumstances. Usually it's the case that somebody has a mental illness or a physical illness or some debilitating situation that prevents them from actually going out and getting a job. But in this type of situation, his history and who he is puts him into that category. He's never going to get there. He's not going to get halfway there. He's always going to need assistance. And this person is kind of unique in that I admit his job search was not good in the time that the trial said go out and either make this company work or get a job search. The company didn't work, and he didn't put enough effort at it. But even if he had, as he said in the testimony, he's a veteran, but he doesn't qualify for the special category at the state because he's not a recent veteran. He doesn't make the CPA, can't do the IT. What he should have done is to go out and say, okay, I'm going out to whatever company, and I'm going to take some courses to try and boost up my IT. Didn't do it. Obviously, that's something the court can take into account. But even had he done that, we're still left with the same thing. And he is living in his mother's home in Verdon, a far cry from what the marital home was in Rochester. His family, his friends, his business, Rochester and Springfield. He can't buy a new car. His wife is driving a 2013 new Volvo. His trips, instead of what they used to go on, his weekend trips to see his brother in Texas. She's going to the Florida Keys three times during the separation. Went twice to South Carolina. One time took the son's girlfriend with him. She has the money. Look at her affidavit. She spends $11,000 a year on clothing between her and the child. She has disposable income. The judge relied, and one of my arguments was the judge relied on their Exhibit 35, and I request that the court kind of look at that and look at what I said the court didn't, you know, basically, actually, financially look at. She overstated self-security. She overstated the maintenance. She overstated what she's putting $2,800 into a retirement, which my client can't. She overstated that she's putting money into a health maintenance plan. By overstating, you mean these were incorrect statements of what she was doing? It's incorrect as far as saying what her net income is. Like, she took a deduction, and the court said, okay, you only got $108,000 left. One of those deductions was $26,000 into a savings account at Heartland that she brings back. So she's disposing of it. In addition to that, she gets now from my client $5,100 in support payments. So when you put that together, instead of having $108,000, disposable money, she has $156,000. What did the trial court say to this argument? They didn't get this argument because this was what the court made its analysis of when it made its ruling. It said it looked at $33,000. And what I'm saying to this court is if you look at $33,000, you can't just look at the bottom line of $108,000. You have to do what I did, which is say, are those deductions something that is legitimately workable or applicable? Did you call that to the attention of the trial court after the order was entered? No, Your Honor. I did not. Well, we have an 18-page decision in this case, which, as you know, speaks well of the trial court's care and attention. This is a panel of trial court alumni, and we're all familiar with how involved and complicated these cases can get. It seems to me that the trial judge made a wonderful effort in this case to try to get it right. And if some of this stuff was not correctly considered because it was inaccurate information, shouldn't the first step have been, judge, gave this 18-page analysis, but you were wrong in that exhibit and giving weight to it, and here's why. Shouldn't you do that before you come up to us and say the trial court erred? I agree that's an option, and maybe it would have been preferable. I think the overriding issue, though, is the court's underlying premise, which would mean that if I took that step, I still believe the court would still have this issue of permanency and amount. I'm sure that's true. And I thought probably, and I guess it's a judgment call, but I thought that the most efficient way, since we're going to be here anyway, we can bring up all of the issues at once. If the judge had maybe taken another look at it, I don't know whether the permanency versus the rehabilitative would have been solved. But I'm assuming this is an argument just made with regard to resources that the parties have, and I guess that deals with the amount of maintenance as well. It does deal with the amount of maintenance. And he may have fixed that, or he may not have, and probably is it better from a trial judge's standpoint to say, hey, your honor, or excuse me, not hey, but your honor. It would work. You know, your honor, take another look at it. Maybe your numbers are crossed or they're not right. Well, you're looking at a guy who's done that. You know, I understand, Mr. Scott, the care and feeding of trial judges is never a certainty. But frankly, if I had written something and was mistaken in my assessment of the underlying facts, I always preferred to have it pointed out to me at the trial level before the case got to the common enemy, otherwise known as this court. And your honor, I mean, I would say as a general practice rule, I would probably say that I live by that same type of code. It's just an analysis and a judgment call. And this one, I think in the overall picture of when we're talking about the two legal issues, that we're going to end up here anyway. I thought it probably is most efficient for my client's use of funds as one of the issues here is who's going to pay me. Fair enough. You know, I mean, that's my judgment call. And so I concede to the court that I normally do what you would suggest. But I think when you look at lifestyles, my client's lifestyle is never going to get up to what it was. And that's why I think permanent funds. Then we look at the amount. And as I laid out, she has about $13,000 plus of disposable money. My client has about $2,200, $2,100. That's huge. And there's no way, even with the maintenance he has, that he can even barely maintain himself in burden. One of the things here is that he's living off of his estate money. Whether he owes his money back to his brother or whether his brother ever sues him or doesn't sue him, whatever the deal is, everything that he lives off of is being paid out of mom's money. Which, as we've seen, is dwindled down to $40,000. And dirt. I shouldn't say dirt, but I mean land. And you have land and $40,000 and a house in burden, and he's got to drive every day back and forth to burden with his dually truck to go work. Well, that's the formula for disaster. He's not going to make it. And he's not going to be able to live in a house in Rochester. He's not going to be able to go on trips. He can't go down to the store and spend $500 a month for clothes. He can't go on nice places out to eat like they used to. He can't go on trips. He can't take someone on trips. He can't give $200 a month in gifts. All of the things they did based upon the earnings and the family financial plan. So what should you do? We ask for you to say, look at the numbers, the $6,000 that we proposed. If you run those numbers, those make sense. And I did the numbers on what the effect is of what he has now, and it's like 7% of her earnings. And that isn't correct. When you take into account, he is getting paid $2,500. He is giving her back $400 after taxes. That's the equivalent of about $500 before, maybe $5.50 in his bracket. And so now he's got $2,000 versus somebody that has $280 less the $2,000. So to take $24 off that, she's about $256. It's just not equitable. It's not fair. And part of what he said was, hey, she's been bearing the burden for this child. No doubt about it. Financially, she covered the child during the separation, and that's to her credit. And this child's got to do extra things because of her money. That's to her credit. But they have to take into account, he had $3,200 of temporary maintenance with no child support and didn't make it. Now he's got $2,500, less effectively over $500 of that gross. He's down below 2 or at 2 to try and make it. It's not equitable. The amount's not equitable. And I believe what we did ask for, she could afford not to diminish her lifestyle and still be able to do all the things that she wants to do. Pay the extra to send the child to Greece. Pay the extra to send the child to Spain. We're not trying to keep the child from doing that, but there's enough money to do that. And the tax effect to her is good. She's in a high-tax bracket. What she pays us, Uncle Sam pays $35 or $37, depends upon the state tax, whatever it's going to be. So, I mean, to the extent that this court can adjust it in one adjustment, that's why we're here. And the same applies for attorney's fees. His attorney's fees are, you know, he owes $20,000 to me before we started this process, obviously. And we asked the court to say, have him pay $15,000. Now, does anybody in this case have a pot of cash other than my client's inheritance? No. But the stream of income would allow that. And if you look at her affidavit, she doesn't owe any fees because she has the money to pay it. My client doesn't unless he invades corpus of his mom's estate. And I don't think the law requires you to invade corpus of your assets. I see my time's up. Well, you have until the red light. Do you want to keep going? Yes. You've got two more minutes. You know, these kind of brain lapses. But I'm just saying, you know, this case is one where a person has some farmland. It's only 50 acres. You're telling him, if you're going to survive, if you're going to maintain a modicum of what you used to do, you invade your principle that you inherited. Versus a lady who makes a lot of money, a lady who can afford to pay it. And what's the equitable solution? We can ignore it. We can say, okay, too bad, buddy, you know, your marriage didn't last 18 years. Too bad you didn't get enough money. And too bad that if you're going to pay your attorney, you have to consume more of your inheritance. And that's, in essence, what he's been placed to do by the trial judge. We don't believe under the law that's cited to you that that's appropriate. We think that this court, and we ask this court, to reverse it, to make it a permanent situation, to establish it at a proper amount, and to tell the trial court to order, or you order directly, that he pay for a portion of my fees, not all of them, but a portion of my fees to try the case that we did in the trial level. And that's what we would ask this court. Thank you. Thank you, counsel. You'll have more time on rebuttal.  Thank you, Justices. May it please the Court. After listening to Mr. Scott, who always does a great job, I want to make sure we go back to what the court originally and actually found. The court found that there was an appropriate award of temporary rehabilitative reviewable maintenance. We have a disagreement about the amount of maintenance and about attorney fees. And all of these are reviewed under an abuse of discretion standard. Judge Steinman said that he called the trial judge's abuse of discretion as a higher standard. It's not whether you or Mr. Scott or I would have written the decision differently. It's could a reasonable person come up with this decision. And I think a reasonable person under the facts of this case, and remember Judge Madonia heard this case from the temporary relief hearing in August of 2013 all the way through trial. And I think Mr. Scott's arguments forget some of the things that happened at the temporary relief hearing. The temporary reviewable rehabilitative maintenance award was $2,500 a month for 24 months, two years. And that's after Mr. Otten had received $3,200 a month for a year. So we're actually looking at three years reviewable. That's a three-year award. Now why would it go three years and why would it be reviewable? Well, in the actual temporary relief hearing and in the temporary relief order, Judge Madonia told Mr. Otten, you need to conduct a job search. This business isn't working. You need to conduct a job search. And what did he do between August of 2013 and June, the time of trial, of 2014? He applied for three jobs. Three jobs. Two jobs through shooterjobs.com, not IT or CPA jobs. What is shooterjobs.com? It's like a paramilitary for hunters. It's like it has nothing to do with IT or CPA work, accounting work at all. The other one was through a place called triplecanopy.com, another hunting, shooting, all fine jobs, but not what Judge Madonia was telling him to do. Go out and use your degrees. Figure out what you need to do. You've got some time. Mr. Otten testified at the trial that it wasn't three six-month periods that it would take to get up to speed in IT to get him ready to go back in the workforce. It was three to six months of training at LRS, I think is what he said, to get up to speed in the IT field. Had not applied to any IT job or CPA job, but said it would take three to six months of training. So Judge Madonia, I don't know how he came up with the exact figure. He gave him 24 months. Take the training, do what you need to do, apply for jobs, and we'll look at it again. And he didn't pick the date 24 months arbitrarily. That's when the party's child will go to school, go to college, and we'll look at what the situation is then. Doesn't mean it's going to terminate then. So there will be no more child support? No more child support at that time. Could there be education expenses? We don't know. That's why he picked that date. It was clear in the evidence that the reviewable portion of the Temporary Rehabilitative Maintenance Award had to do with, okay, I told you once to do a job search. Mr. Scott didn't do it. So I'm going to give you another chance. You said three to six months, and we'll come back and look at this. With the $2,400 a month, which is a reduction from the $3,200 Temporary Award, now during the temporary period, there was no child support paid. With the $2,400 a month, he does have to pay child support, $425 a month. Where did the $2,400 come from? Well, if you look at the judge's order, and I agree that the judge's order is fairly thorough, we had some major problems with Mr. Otten's testimony and his financial affidavits, plural. He lists these debts that Mr. Scott addressed to his brother. Between the August 2013, January 2014, and June 2014 affidavits, the number he owed to his brother radically increased and went down again, even though he said he made one $200 payment towards that amount. The judge said in his opinion, I found that debt to be concocted for the purposes of litigation, that that debt he did not believe even existed. Then we went through his most recent affidavit, the June 2014 affidavit, and we went through his living expenses, what he listed as his living expenses. And I put this in my brief of what he used the $3,200 a month he received from my client to pay for living expenses. And he went through these. Rent, real estate taxes, home insurance, cable television, Internet, these are all expenses he listed that he had to pay on his affidavit. And this is in my brief, but laundry, dry cleaning, loan, federal taxes, not one of these payments were made out of the maintenance award. And the judge said that the wife, Ms. Otten, made a verifiable argument that these expenses weren't real, that he didn't have these expenses. On the attorney fees... What do you mean weren't real? I'm not sure. Well, he lists... He's got to live someplace, doesn't he? Well, yes, you would think he would have to live someplace, but he gets $3,200 a month in maintenance that he requested. We go through his affidavit and we ask which of these were paid by this maintenance. None of those were paid. He said he paid for some of them out of the estate account. Some he said he didn't pay at all. He was just listing them on his affidavit. The judge was very skeptical of Mr. Otten's testimony with regard to his financial expenses. Also, let me go back just for a second, because it's right in line with this, to the temporary relief hearing. In the temporary relief hearing, which was in August of 2013, Mr. Otten has a lawn business, not profitable lawn business. He testified in the temporary relief hearing that since May 1st of 2013, he hadn't sent out any invoices to his customers. Why isn't the business bringing in money? I haven't sent out any invoices. Another reason why Judge McDonough is sick. You need to go out and get a job, and you need to get your training, and that's why he picked a 24-month period. It's way longer, four times longer than what Mr. Otten said he needed to get the training to go in the IT field. Let me step back also to the CPA. It's true that Mr. Otten worked as a CPA first at SickEdge, then at Clifton Gunderson. It's not that he wasn't successful or didn't do a good job in his accounting field. They transitioned him into an IT job at Clifton Gunderson, and then after he got laid off at Clifton Gunderson, he continued to work in the IT field. For someone to say there was no testimony whatsoever that he would be capped out in the IT field at $56,000, and I just frankly don't believe that. He provided testimony. He did not even investigate state jobs, accounting jobs with the state of Illinois, and did no other. He just said, I'm not qualified for any of those, but didn't know anything about the jobs that we showed him actual postings for. Knew nothing about them. With regard to the attorney fees. You did that at the hearing? You showed them the postings? Yes. Now, for the state of Illinois, particularly right here in Springfield, I would think there would be a lot, and I'm wondering if this is what you showed them, a lot of potential jobs like accounting jobs where you wouldn't need to be a CPA. I believe there was brief testimony that on a couple of them they needed to be CPAs. That's absolutely true. The purpose of actually showing him the exhibit was that he kept saying there were no accounting jobs at all, and it's just simply not true. What was his testimony when you showed him those exhibits? He said that he had not applied for any of those jobs, and he said that his veteran status wouldn't have helped him with those jobs because he had got out of the Army for too long. But he said he never looked at any of those jobs. So I don't know which is right. He either didn't look for them, or he investigated them and found out his veteran status wouldn't help. With the attorney fees issue, Mr. Scott cites the law in his brief that a court may require one party to pay another party's reasonable attorney fees if the party seeking fees is unable to pay. Well, Mr. Otten is certainly able to pay. Now, he may have to pay for some of it with his non-marital money, but he has cash accounts in his non-marital estate, and the other party is able to pay. And I don't believe Ms. Otten is able to pay. She received far less marital property, and she had to divide her pension. The Pond and Pomeranke case, I think out of the 2nd District, said that the court is not to look at whether the lower court could have awarded attorney fees, but rather did it abuse its discretion in not awarding fees. And I don't think it did abuse its discretion. The court went through in the maintenance and rehabilitative maintenance and amount of maintenance and child support section, all the things, all the responsibilities Ms. Otten took on her shoulders. And there was extensive testimony about the costs associated with their son, Avery. Avery's interests are in audiovisual field. He works with computers. He plays, I believe, 4 different instruments, and one of them is drums, which is 11 different instruments. This is all before they were separated. He's already looking at colleges. He's working at colleges. In fact, he's looking for colleges all this summer. He's had interest from colleges on the East Coast and on the West Coast. He has expensive hobbies. He doesn't participate in athletics because he has vision problems, but he's very into music and audiovisual. We're not talking about video games. We're talking about audiovisual development. This has been since before the parties separated. He will go to summer camps. He's been to summer camps at Northwestern University. This is a child with some large expenses. She's carried the burden of this. And Judge Madonia pointed out in his decision, but I believe this was in the maintenance discussion, he did not make Mr. Otten pay any temporary child support. But with all the money Mr. Otten got from maintenance and from his non-marital estate, and there was money spent from his non-marital estate during the separation period, not a penny was contributed to Avery Otten's lifestyle, activities, anything. Nothing. And the judge said, he's shown he's not going to do that unless I make him do it. And I expect Ms. Otten is going to have to carry the burden of this. And the judge took that into account. And there are appellate court cases that say you can take that into account in reviewing a maintenance award. And the judge was very firm that he is taking into account the expenses of the child. Again, I know you've read Judge Madonia's opinion, but he goes through in great detail all the factors in dealing with maintenance. He doesn't deny maintenance, but he cites to the Ward case, I think. Yeah, the Ward case. And he says that my maintenance award and maintenance awards in general are designed to make the maintenance-receiving spouse employable, self-sufficient, to cut the ties. And that's what he's done with Ms. Otten. Remember, this is the second time he's told Ms. Otten, you've got to find a job. You've got to go out and look for a job. Not at shooterjobs.com. You have to go to IT field. Get your training. You've got time. Get your training. But he's told, Mr. Otten has told the judge twice, I've got to stop this lawn care business. It's not profitable. I've got to get into something else. And the judge is encouraging him to do that. At the end of Mr. Scott's reply brief, he states that the cases that he wants you to consider most are Bramson, Heroy, and Dunlop. And I'm happy for you to consider those cases in connection with this case. In Bramson, we were dealing with a 20-year marriage. And what the court did then was say that maintenance was awarded for a specific period of time after the party's youngest child turned 18. I think it was five years. And the court said, since that's a few years out, and then another five years after the child turns 18, you can't just end it then. We have to have some mechanism to review it. We don't know what's going to happen after those five years. Well, that's exactly what Judge Madonia is doing in this case. He's saying, let's reconvene in two years, and let's figure out where we're at. And again, Mr. Otten can use these two years to get moving, or he can do what he did during the temporary relief period, which is absolutely not the case. And the second case Mr. Scott asked you to consider is In re Marriage of Heroy. That case, I don't understand how it's applicable, but that was a 26-year marriage, and the maintenance award was $35,000 per month to the maintenance-receiving spouse. In that case, the wife had been a law librarian over 20 years before the divorce, but then stayed home with the kids. And there was extraordinary evidence on the party's lavish lifestyle. There was really no evidence in this case about a lavish lifestyle. In fact, I would suggest that the parties have a pretty modest lifestyle. They did take trips. The testimony would say that the trips were associated mainly with my client's work, and they would add a day on at the end of the vacation. And I think during the temporary period, they both went the same number of trips. I believe that's conceded in the testimony. When Ms. Otten did travel to South Carolina, it was to be with her sister.  Mr. Scott emphasized, and he's correct, is he not, that there will be a serious diminution in the lifestyle of his client? I don't believe that's true. I don't believe it's true, and I don't believe in any way he proved it because of his testimony about his affidavits and because the judge gets to determine credibility when he was examined or cross-examined, when Mr. Otten was cross-examined about his financial affidavits. He came back with almost indecipherable answers to my questions about basic expenses. Also, you heard my question of Mr. Scott with regard to the assertions he made that some of the information your clients have in their affidavit wasn't correct. What about that? This is the Exhibit 35 that he was talking about. I agree that that should have been brought up in the court below, but I think the most important part is Judge Madonia did not ignore Exhibit 35, took it into account, but he didn't itemize it. What he said is that my client's income was misleading because there were, quote, substantial limitations on her cash flow, and then Judge Madonia went through those limitations, and it wasn't 401k contributions. It was amounts of money she had spent on the child. It was amounts of money to pay for the child's insurance. It was a thing like that. Can Mr. Scott cherry-pick certain bullet points in Exhibit 35? I'm sure he probably can. But that's not what the judge found. The judge found that these were legitimate expenses, that when you hear somebody is making $280,000 a year, whoa, that's a lot of money. And I think what Judge Madonia was saying, it's not when you look at what she has to pay out of that. It's not. She has terrific responsibilities with the party's child, and those were agreed to. I mean, those were agreed. Ms. Rotten did not dispute that the child had heavy expenses. She's got the insurance coverage for the child. She's got uncovered medicals. And the judge noted since 2011 when the parties separated after an OP, she had carried the entire burden for the child and the household expenses, the entire burden. So we would ask that the court uphold the decision of the trial court. Thank you. Thank you, Mr. Cross. Mr. Scott, any rebuttal? Yes, Sharon. A couple things. First of all, Mr. Cross describes the lifestyle as modest. The judge acknowledged in his ruling that my client can't even make modest. So he's below modest, you know, not quite the man down by the river, but it's substantially less. The other thing is that, you know, if you look at her affidavit, she has expenses that are less than her – I mean, her expenses are considerably less than what she brings home now. Paying the higher temporary maintenance, paying all of these expenses for this child and all of his extra and his instruments and his camps and everything, he has leftover money. Paying the higher amount of maintenance in temporary. With regard to the temporary, if you look at the time that my client, he says he didn't use the money for his expenses, and he says he couldn't explain his affidavit. He explained his affidavit as he said, I'm not paying taxes now because I didn't earn enough, but the taxes that are in my affidavit are based upon what I have projected for this year. So he hasn't paid those. The tuition expense, $400 a month. I have not paid that because my son starts in June of 2014. So, yeah, I didn't pay that. The COBRA, $510 a month versus her $190 a month that covered him in the past. I haven't paid that, but I certainly am starting in September of 2014. All of those – and he says the utility expense, I didn't pay it. Nope. Charged it to the estate. I guess I paid half. But he explained that he's not paying it direct, but it's coming out of his money. The jobs that he referred to that Mr. Cross said, hey, didn't you check this? Didn't you go do this? He said, I don't qualify. But even if I qualify, what he was showing him were jobs between $30,000 and $50,000. Same thing that I'm saying to the court now. Mr. Otten lost $7,000 in actual money in 2012 running this business, which is part of the time while he was under the temporary maintenance. It's got to come from somewhere. He lost money by $1,000 in 2013. In 2013, when he took over the assets, he wasn't doing the books. She said, here's the books. He put it in his machine. He testified, I blew it. I crashed my machine. I had to go learn how to put it up again. So two months it took for him to do that. Is he timely? No. Is the business closed now? Nope. It's still doing what it's doing. Part of the problem is when you say to a person, here's some money, you've got a choice of dumping the business today and going out and trying to do something, and is that he has existing customers, existing people for years that I guess he could say cut your own lawn. But what he did is finish out that season and tried to hang on another year. Is it something I would do? No. But that's a choice that I guess he chooses. Did you ever look into the issue of whether a veteran's benefit or priority is based on nearness of service? He actually did that, contrary to what Rob remembers. He actually did go check at the state to see if he would qualify as a special benefit. I've never heard that before. Did you check yourself? Did I check it? No, I apologize. That's all right. I didn't. But actually, to some extent, when he says he has done some things, he really has. I mean, whether they're things I would choose to do or not, that's a different story. But I wanted to point those out. I wanted to point out that he had a choice. He could abandon the existing contracts or try to fulfill what he chose to do. When the expenses, they are real expenses, it takes him some money to live, and he's living much below what she is. So we would ask for the relief previously. Thank you for your time. Thank you, Mr. Scott. We'll take this matter under advisement. This meeting is recessed.